# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK BIRCH and CRYSTAL BIRCH,** | : | **No.** |
| **Individually and as Husband and Wife,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GFG PEABODY, INC.,** | : | |
| **Defendant** | : | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiffs, Mark Birch and Crystal Birch, Individually and as Husband and Wife, hereby bring this Complaint against GFG Peabody, Inc., and in support hereof, aver as follows:

## PARTIES

1.   Plaintiff, Mark Birch ("Plaintiff") is an adult individual who resides in the Commonwealth of Pennsylvania at 2570 Pike Avenue, Coopersburg, PA  18036.

2.   Plaintiff, Crystal Birch ("Spouse-Plaintiff") is an adult individual who resides in the Commonwealth of Pennsylvania at 2570 Pike Avenue, Coopersburg, PA  18036.

3.   At all times relevant hereto, Plaintiffs, Mark Birch and Crystal Birch, resided together as husband and wife.

4.   Defendant, GFG Peabody, Inc. ("Defendant" or "GFG"), is a corporation, partnership, limited partnership, incorporated association, unincorporated association, limited liability corporation, limited liability partnership or other business entity that it is a

citizen of the State of Wisconsin where it maintains a registered office and regular place of business at N53 W24900 S. Corporate Circle, Sussex, WI  53089.

5.   At all times relevant hereto, Defendant regularly and continuously did business within the Commonwealth of Pennsylvania.

6.    At all times relevant hereto, Defendant acted and/or failed to act by and through its agents, agencies, servants, workmen, divisions, subsidiaries and/or employees acting within the course and scope of their employment and in furtherance of Defendants' business interests.

## JURISDICTION AND VENUE

7.   This Court has diversity jurisdiction under Section 1332(a)(1) of Title 28 of the United States Code, 28 U.S.C. Section 1332(a)(1),(a)(2) and (c)(1).

8.   This Court has venue over this action pursuant to 28 U.S.C. Section 1391(b)(2).

### FACTS

9.   At all times relevant hereto, Plaintiff was employed by Vorteq Coil Finishers, LLC ("Vorteq"), 2233 26th Street SW, Allentown, PA  18103.

10.   Prior to July 24, 2019, Vorteq purchased from Defendant an S Wrap Finisher Coater believed to be Model No: S3 (RT)/S3 (AR) 3060 HD (the "Product").

11.   Said Product was supplied to Vorteq by Defendant and installed at the aforesaid Vorteq facility by Defendant, or third parties under the direction and control of Defendant.

12. At all times relevant hereto, Defendant, was engaged in the business of designing, fabricating, manufacturing, marketing, advertising, distributing, supplying, selling, maintaining, installing, servicing, repairing, inspecting and/or leasing various model coaters, including S wrap finish coaters such as the Product, prime coaters, vertical roll coaters and dual head quick color change coaters.

13. Defendant designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the subject Product.

14. At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant hereto, Defendant intended that the Product be equipped with, and the Product was, in fact, equipped with, an applicator roll and a pick up roll located in close proximity to and next to each other on the Product. A photograph depicting the location and configuration of the subject applicator roll and pick up roll is attached hereto as Exhibit "A".

15. At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant hereto, Defendant specified a maximum diameter applicator roll of 9.5 inches and a minimum diameter applicator roll of 8 inches, and a pick up roll diameter of 10 inches.

16. At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant hereto,

Defendant intended, or it was reasonably foreseeable to Defendant that the Product's applicator roll be comprised of a metal roll with a non-metallic, elatomeric surface having significant thickness.

17.  At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant hereto, Defendant intended, or it was reasonably foreseeable to Defendant that the non-metallic surface of the applicator roll may deform under pressure, distorting the overall circular shape of the applicator roll when pressure was applied.

18.  At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant hereto, Defendant intended that, or it was reasonably foreseeable to Defendant that the Product would be used by the intended and foreseeable users thereof while equipped with an applicator roll having an overall diameter between 8 inches and 9.5 inches and a pick up roll having an overall diameter of 10 inches.

19.  Defendant designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product in a condition whereby when the Product was operated in forward code in the intended, ordinary, reasonable and reasonably foreseeable use with an applicator roll having a diameter between 8 inches and 9.5 inches, the rotation of the applicator roll and pick up roll created a nip point hazard between the two rolls.

20.   At all times relevant hereto, Defendant knew, or should have known, that Defendant designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product in a condition whereby when the Product was operated in forward code in the intended, ordinary, reasonable and reasonably foreseeable use with an applicator roll having an overall diameter between 8 inches and 9.5 inches, the rotation of the applicator roll and pick up roll created a nip point hazard between the two rolls.

21.   At all times relevant hereto, Defendant knew, or should have known, that the aforesaid nip point hazard posed a serious risk of severe bodily harm to the intended or reasonably foreseeable users of the Product while using the Product in its intended, ordinary, reasonable or reasonably foreseeable use.

22.   At all times relevant hereto, Defendant knew, or should have known, that in order for the Product to be safe for its intended, ordinary reasonable or reasonably foreseeable use, the Product must include design elements to prevent or protect an operator's body parts from encountering and entering the nip point while the Product was being operated in forward code including where pressure was applied to the surface of the applicator roll from a user's body part, distorting the circular shape of the applicator roll.

23.   Defendant designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product with a metal structural member extending across the Product that was located between the applicator roll and pick up roll above the aforesaid nip point hazard

running parallel to the rolls.  The subject metal structural member is depicted on the photograph attached hereto as Exhibit "A".

24.   At the time when Defendant designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product with a metal structural member installed between the applicator roll and pick up roll above the aforesaid nip point hazard, and at all other times relevant hereto, Defendant intended, or it was reasonably foreseeable to Defendant, that that the aforesaid rolls and metal structural member be accessible to intended, ordinary, reasonable and reasonably foreseeable users while the Product was being operated in forward code, that said users of the Product would be operating the Product in close proximity to the aforesaid rolls and metal structural member while the Product was being operated in forward code and may touch the metal structural member with body parts or other objects to perform functions necessary to the intended, ordinary, reasonable or reasonably foreseeable use of the Product, including but not limited to removing paint or chemical substances located on the top-side of metal part deposited there during the Products intended or reasonably foreseeable use with the use of a rag or other object.

25.   Upon information and belief, at all times relevant hereto, Defendant may have intended the aforesaid metal structural member to function as a nip point or point of operation guard to protect or prevent an operator's body part from entering the nip point hazard while the Product was being operated in forward code.

26.   At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased by Defendant, and at all other times relevant

6

hereto, the aforesaid metal structural member did not protect or prevent body parts of users from entering the nip point hazard during the intended, ordinary, reasonable or reasonably foreseeable use of the Product.

27.   At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product, and at all other times relevant hereto, Defendant knew, or should have known, the aforesaid metal part did not protect or prevent users from encountering the nip point hazard during the intended, ordinary, reasonable or reasonably foreseeable use of the Product.

28.   At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product, and at all other times relevant hereto, the Product did not include any features or design elements that protected or prevented the body parts of intended, reasonable, ordinary or reasonably foreseeable users from entering the nip point hazard during the intended or reasonably foreseeable use of the Product.

29.   At the time when the subject Product was designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product, and at all other times relevant hereto, Defendant knew, or should have known, that the Product did not include any features or design elements that protected or prevented intended or reasonably foreseeable users from encountering the nip point hazard during the intended or reasonably foreseeable use of the Product.

30.   Despite Defendant's knowledge as aforesaid of the existence of the nip point hazard, the aforesaid severe danger the nip point hazard presented to the intended or reasonably foreseeable users of the Product, and Defendant's need to include design elements or features in the Product to prevent or protect intended or reasonably foreseeable users from encountering the nip point hazard during the intended, ordinary, reasonable or reasonably foreseeable use of the Product, Defendant consciously disregarded the risk of harm and designed, fabricated, manufactured, marketed, advertised, distributed, supplied, sold, maintained, installed, serviced, repaired, inspected and /or leased the Product without design elements or features to protect or prevent intended or reasonably foreseeable users from encountering the nip point hazard during the intended, ordinary, reasonable or reasonably foreseeable use of the Product.

31.   On or about July 24, 2019, Plaintiff was using the Product while in the course and scope of his employment for Vorteq at the aforesaid Vorteq facility.

32. On the date and at the time and place as aforesaid, Plaintiff observed the presence of a chemical on the top of the aforesaid metal structural member that was deposited there during the intended, ordinary, reasonable or reasonably foreseeable use of the Product.

33.   On the date and at the time and place as aforesaid, Plaintiff attempted to clean the aforesaid chemical from the metal structural member while the Product was in forward code with a small a rag, and his left upper extremity entered the space between the metal structural member and the applicator roll and was pulled through the space and down into the nip point by the rotation of the applicator roll, which pulled his left upper

extremity into the nip point hazard, causing Plaintiffs to suffer the injuries and damages more fully set forth at length below.

34.   At all times relevant hereto, Plaintiff was an intended or reasonably foreseeable user of the Product, and was using the Product in its intended, ordinary, reasonable or reasonably foreseeable use when his body parts were pulled into the nip point hazard.

35.   The Product was designed, manufactured, distributed, marketed, advertised, installed, maintained, repaired, serviced, leased and sold by Defendant with dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer while using the Product in its intended, ordinary, reasonable and reasonably foreseeable uses, including but not limited to the following:

(a). it included an unprotected nip point hazard that was accessible to and could be entered by body parts of intended, ordinary, reasonable, and reasonably foreseeable users during the intended, ordinary, reasonable or reasonably foreseeable use of the Product;

(b). it lacked design elements or features for the purpose of preventing or protecting the body parts of an intended, ordinary, reasonable, or reasonably foreseeable user from entering the nip point hazard during the intended or reasonably foreseeable use of the Product, design elements or features that may include but not limited to, one or more of, or a combination of any of the following:

(i).  it lacked an effective nip point hazard barrier guard that prevented or protected a person's body part from approaching or entering the nip point hazard;

(ii). it lacked a hard-braking system for the drive system that prevented or protected a person's body part from approaching or entering the nip point hazard;

(iii). it lacked a brief auto-reverse drive system function that prevented or protected a person's body part from approaching or entering the nip point hazard;

(iv). it lacked a rigid nip point barrier guard with a gap small enough to prevent the user's body parts from entering the nip point hazard while the Product was being operated in forward code;

(v). it lacked a proximity sensor to prevent/interrupt operation of the Product in forward code if the rigid nip point hazard barrier guard is not sufficiently close to the applicator and pick up rolls forming the nip point hazard;

(vi). it lacked a sensor bar in the space between the applicator and pick up rolls to detect the entry of a body part into the space approaching or entering the nip point hazard while the Product was being operated in forward code;

(vii). it lacked a photoelectric eye across the space between the applicator and pick up rolls to detect the entry of any body part into the space before the body part approached or entered the nip point hazard when the Product was being operated in forward code;

(viii). it lacked a laser detector system across the space between the applicator and pick up rolls to detect the entry of any body part into the space before the body part approached or entered the nip point hazard when the Product was being operated in forward code;

(ix). it lacked a radio frequency (capacitance) detector system across the space between the applicator and pick up rolls to detect the entry of any body part into the space before the object approached or entered the nip point hazard when the Product was being operated in forward code;

(x). it lacked a presence sensing device to detect any body part entering the protected area above the in-running nip point hazard before the body part approached or entered the nip point hazard when the Product was being operated in forward code;

(xi). it lacked a light curtain system to detect any body part entering into the protected space above the in-running nip point hazard before the body part approached or entered the nip point hazard when the Product was being operated in forward code;

(xii). it lacked a camera and machine vision to detect the entry of a body part into the restricted space between the applicator roll and pick up roll before the body part approached or entered the nip point hazard when the Product was being operated in forward code;

(xiii). it lacked presence sensing mats in the area from which a nip point hazard can be accessed to prevent or protect a body part from

10

approaching or entering the nip point hazard when the Product was being operated in forward code;

(xiv).  it lacked a cover over the entire rolls forming the in-running nip point hazard interlocked to prevent or interrupt Product operation when opened or removed while the Product was being operated in forward code;

(xv). it lacked a protective enclosure (e.g. perimeter fencing) around the Product with gates or access panels interlocked to prevent or interrupt Product operation when opened or removed while the Product was being operated in forward code;

(xvi).  it lacked control functionality that immediately stops and/or briefly reverses the Product operation upon detection device signal of a body part approaching or entering a nip point hazard while the Product is being operated in forward code;

(xvii). it lacked a displacement body bar, pressure-sensitive safety bumper or trip wire across the nip point hazard area to actuate emergency stop and prevent a body part from approaching or entering the nip point hazard during forward code;

(xviii).  it lacked extended accessory tools to perform any needed remedial intervention for quality during operation of the Product during forward code without extending hands/ arms inside the perimeter of the Product operating environment;

(xix).  it lacked automatic kick-out roll separation upon sensing contact load in excess of normal operating interface pressure;

(xx).  it lacked automatic kick-out roll separation upon detection device signal of body part approaching or entering a nip point hazard or emergency stop actuation;

(xxi).  it lacked a programmable logic controller and screw jack actuator on a guard between the applicator roll and pick up roll that rotates the guard mechanically to close the gap between the guard and the applicator roll such that the gap was small enough to prevent a body part from approaching or entering the nip point hazard during operation of the Product in forward code;

(xxii). it lacked warnings on the Product and in manuals, videos, and literature supplied to the purchaser and user to properly and adequately warn the user not to approach or touch the top side of the metal structural member with a body part, rag, or object while the Product was in forward

code because the user will be exposed to a severe danger of a body part entering the nip point hazard;

(xxiii).  it lacked warnings on the machine and in manuals videos, and literature supplied to the purchaser and user to properly and adequately inform and instruct the user that a user's body parts will be exposed to and enter the nip point hazard if the user placed a body part or object in his or her hand on the metal structural member when the Product was being operated in forward code.

36.  At all times relevant hereto, the aforesaid dangers were unknowable and unacceptable to the average or ordinary consumer using the subject Product in the intended, ordinary, reasonable and reasonably foreseeable uses.

37.  At all times relevant hereto, Defendant knew, or should have known, of the existence of the aforesaid dangers and that the aforesaid dangers were unknowable and unacceptable to the average or ordinary consumer using the subject Product in the intended, ordinary, reasonable and reasonably foreseeable uses.

38.  At all times relevant hereto, a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended or reasonably foreseeable user or consumer using the Product in its intended, ordinary, reasonable and reasonably foreseeable use outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product in its intended, ordinary, reasonable and reasonably foreseeable uses.

39.  At all times relevant hereto, Defendant knew, or should have known, that a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable

user or consumer using the Product in its intended, ordinary, reasonable and reasonably foreseeable use outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product in its intended, ordinary, reasonable and reasonably foreseeable uses.

40.   Because the Product was designed, manufactured, distributed, marketed, advertised,  installed, maintained, repaired, serviced, leased and sold by Defendant with the existence of the aforesaid dangers which were unknowable and unacceptable to the average or ordinary consumer using the subject Product in the intended, ordinary, reasonable and reasonably foreseeable uses, and a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer using the using the Product in its intended, ordinary reasonable and reasonably foreseeable use outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product in its intended, reasonable and reasonably foreseeable uses, the Product was designed, manufactured, distributed, marketed, advertised,  installed, maintained, repaired, serviced, leased and sold by Defendant in a defective condition unreasonably dangerous to the intended, ordinary or reasonably foreseeable users, such as Plaintiff, while using the Product in its intended, ordinary, reasonable and reasonably foreseeable uses.

41.   At all times relevant hereto, Defendant knew, or should have known, that because the Product was designed, manufactured, distributed, marketed, advertised,

installed, maintained, repaired, serviced, leased and sold by Defendant with the existence of the aforesaid dangers which were unknowable and unacceptable to the average or ordinary consumer using the subject Product in the intended, ordinary, reasonable and reasonably foreseeable uses, and a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer using the using the Product in its intended, ordinary reasonable and reasonably foreseeable use outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product in its intended, reasonable and reasonably foreseeable uses, the Product was designed, manufactured, distributed, marketed, advertised,  installed, maintained, repaired, serviced, leased and sold by Defendant in a defective condition unreasonably dangerous to the intended, ordinary or reasonably foreseeable users, such as Plaintiff, while using the Product in its intended, reasonable and reasonably foreseeable uses.

42. The aforesaid dangers which rendered the Product defective and unreasonably dangerous, were present in the Product at the time when said Product left the possession and/or control of Defendant, or, in the alternative, were created by additions or modification to the Product made by third parties to Defendant's specifications and with Defendant's knowledge, intent, expectation, or reasonable belief that said additions or modifications would be made to the Product by third parties after it left Defendant's possession or control in order for the Product to be used by Defendant's

intended, ordinary, reasonable or reasonably foreseeable user as intended, or reasonably foreseeable to Defendant.

43.   At all times relevant hereto, Defendant knew, or should have known, that aforesaid dangers which rendered the Product defective and unreasonably dangerous, were present in the Product at the time when said Product left the possession and/or control of Defendant, or, in the alternative, were created by additions or modification to the Product made by third parties to Defendant's specifications and with Defendant's knowledge, intent, expectation, or reasonable belief that said additions or modifications would be made to the Product by third parties after it left Defendant's possession or control in order for the Product to be used by Defendant's intended, ordinary, reasonable or reasonably foreseeable user as intended, or reasonably foreseeable to Defendant.

44.   At all times relevant hereto, Defendant designed, manufactured, distributed, marketed, advertised,  installed, maintained, repaired, serviced, leased and sold the Product, with knowledge of, or in conscious disregard of the defective and unreasonably dangerous condition of the Product, and with knowledge of, or in conscious disregard of the severe risk of harm existing thereby to the intended, ordinary, reasonable and reasonably foreseeable user or consumer using the Product in its intended, ordinary, reasonable and reasonably foreseeable uses.

45.   At all times relevant hereto, alternative feasible designs existed for the Product, that would have prevented the subject accident and that would have rendered the Product safe and not unreasonably dangerous for its intended, ordinary, reasonable and reasonably foreseeable uses by the intended, ordinary, reasonable and reasonably

foreseeable user or consumer, including but not limited to said design features set forth in paragraph 35 above.

46.   At all times relevant hereto, Defendant knew, or should have known, that alternative feasible designs existed for the Product that would have prevented the subject accident and that would have rendered the Product safe and not unreasonably dangerous for its intended, ordinary, reasonable and reasonably foreseeable uses by the intended, ordinary, reasonable and reasonably foreseeable user or consumer such as Plaintiff.

47.   At all times relevant hereto, all Defendants designed, manufactured, distributed, marketed, advertised,  installed, maintained, repaired, serviced, leased and sold the Product with knowledge of, or in conscious disregard of the existence of alternative feasible designs for the Product that would have prevented the subject accident and that would have rendered the Product safe and not unreasonably dangerous for its intended, reasonable and reasonably foreseeable uses by the intended, ordinary, reasonable and reasonably foreseeable user or consumer, and with knowledge of, or in conscious disregard of the severe risk of harm existing to the intended, ordinary, reasonable and reasonably foreseeable user or consumer using the Product in its intended, reasonable and reasonably foreseeable uses absent the implementation of the alternative feasible designs.

48.   The defective and unreasonably dangerous condition of the Product was the direct and proximate cause of the accident and Plaintiffs' injuries and damages more fully set forth at length below.

16

**COUNT I**

**Mark Birch v. GFG Peabody, Inc.**

**(NEGLIGENCE)**

49.  Plaintiff, Mark Birch, incorporates the preceding paragraphs by reference as if fully set forth at length herein.

50.  The injuries and damages to Plaintiff were directly, proximately, substantially, and legally caused by the carelessness, negligence, gross negligence, and recklessness of Defendant, GFG Peabody, which consisted of, *inter alia*, the following:

(a).  Designing, manufacturing, marketing, distributing, supplying, marketing, advertising, maintaining, installing, servicing, repairing, leasing and/or selling said Product in the defective and unreasonably dangerous condition, when Defendant knew, or should have known, of the defective and unreasonable dangerous condition;

(b).  Designing, manufacturing, marketing, distributing, supplying, advertising, maintaining, servicing, installing, repairing, leasing and/or selling said Product in the defective and unreasonably dangerous condition, when Defendant would have discovered said condition upon reasonable inspection, testing and analysis and eliminated said defective and unreasonably dangerous condition;

(c).  Designing, manufacturing, marketing, distributing, supplying, advertising, maintaining, servicing, repairing, installing, leasing and/or selling said Product, when Defendant knew, or should have known of the defective and unreasonable dangerous condition thereof, when Defendant did not incorporate the state of the art in science, engineering, and in similar product manufacturing industries;

(d).  Designing, manufacturing, advertising, marketing, distributing, advertising, supplying, maintaining, servicing, installing, repairing, leasing and/or selling said Product without adequate instructions when Defendant knew, or should have known that the lack of adequate instructions rendered said Product defective and unreasonably dangerous;

(e).  Failing to warn or properly and adequately warn Plaintiff, and others similarly situated, of the defective and unreasonable dangerous condition as aforesaid of the Product, of which Defendant knew, or should have known;

(f).  Failing to instruct or properly and adequately instruct Plaintiff and others similarly situated, in the safe use of said Product;

(g).  Failing to inspect or properly and adequately inspect the said Product for the presence of the aforesaid defective and unreasonably dangerous condition;

(h).  Failing to design, manufacture, install, maintain, lease, service, distribute and/or maintain said Product in a condition that was safe and not unreasonably dangerous;

(i).  Failing to repair the defective and unreasonably dangerous condition of said Product when Defendant knew, or should have known, of the defective and unreasonably dangerous condition;

(j).  Failing to timely and properly repair the defective and unreasonably dangerous condition of the Product, of which Defendant knew, or should have known;

(k).  Failing to design, manufacture, install, repair, service, distribute, sell, lease, and maintain the subject product with proper, safe and effective nip point protection;

(l).  Violating various statutes, codes, ordinances, rules and regulations of the United States of America, the Commonwealth of Pennsylvania and other local governing bodies;

(m).  Failing to hire, employ and/or promote various agents, servants, workmen and/or employees with the responsibility and obligation to properly install, inspect, service, design, manufacture,  maintain, train, instruct, and lease the Product and warn users regarding the use and dangers thereof and repair the Product;

(n).  Failing to use reasonable care in hiring, employing and/or promoting various agents, servants, workmen and/or employees who had the responsibility and obligation to properly supply, manufacture, design, inspect, install, maintain, service, repair, instruct, train and lease the Product and warn users regarding the use and dangers of the Product, and sell the Product;

(o).  Permitting the various agents, servants, workmen and/or employees who had the responsibility and obligation to properly design, install, manufacture, sell, inspect, maintain, service, lease, and/or repair said Product, and instruct, train and warn users regarding the use and dangers thereof to continue to work as agents, servants, workmen and/or employees, when said Defendant knew, or should have known, that said agents, servants, workmen and/or employees were unable to, refusing to and/or incapable of properly performing said requirements of their respective employments;

(p).  Failing to establish procedures and programs to determine whether employees and/or potential employees charged with the responsibility and obligation to properly design, manufacture, sell, inspect, distribute, install, maintain, repair, lease and service said Product, and to instruct, train and warn users regarding the use and dangers thereof were fit, capable of, or actually properly performing the requirements of their respective employment;

(q).  Failing to create policies, procedures, rules and programs in connection with the design, manufacture, sale, inspection, distribution, installation, maintenance, repair, leasing, repair and service of said Product, that were necessary in order to ensure that said Product was safe for its intended and reasonably foreseeable uses, when Defendant knew, or should have known, of said failure and the severe risk of harm to users created by said failure;

(r).  Failing to follow or violating Defendant's policies, procedures, rules and programs in connection with the design, manufacture, sale, inspection, distribution, installation, maintenance, repair, leasing and service of said Product that were necessary in order to ensure that said Product, was safe for its intended and reasonably foreseeable uses, when Defendant knew, or should have known, of said failure and the severe risk of harm to users created by said failure;

(s).  Failing to communicate to Defendant's employees and all intended or reasonably foreseeable users Defendant's policies, procedures, rules and programs in connection with the design, manufacture, sale, inspection, distribution, installation, maintenance, repair, leasing and service of said Product, that were necessary in order to ensure that said Product was safe for its intended and reasonably foreseeable uses, when Defendant knew, or should have known, of said failure and the severe risk of harm to users created by said failure;

(t).  Failing to enforce Defendant's policies, procedures, rules and programs in connection with the design, manufacture, sale, inspection, distribution, installation, maintenance, repair, leasing and service of said Product that were necessary in order to ensure that said Product was safe for its intended and reasonably foreseeable uses, when Defendant knew, or should have known, of said failure and the severe risk of harm to users created by said failure;

(u).  Designing, manufacturing, advertising, marketing, distributing, supplying, maintaining, servicing, installing, repairing, leasing, formulating, servicing, processing and/or selling the Product with reason to know of, and/or with reckless indifference to the existence of the defects and unreasonably dangerous conditions, when Defendant knew, or should have known of its negligent, careless, reckless and intentional conduct set forth above and the high degree of risk of harm posed to the user as a result thereof;

(v).  Failing to perform hazard, safety, fault tree and risk/utility analyses upon the Product when the performance of said analyses would have uncovered the defective and unreasonably dangerous condition;

(w).  Failing to properly perform hazard, risk assessment, job safety, fault tree and risk/utility analyses upon the Product when the performance of said analyses would have uncovered the defective and unreasonably dangerous condition;

(x).  Improperly ignoring or disregarding the results of hazard, risk assessment, job safety, fault tree and risk/utility analyses which identified the existence of the dangerous and unreasonably dangerous condition of the Product;

(y).  Continuing to manufacture, sell, inspect, distribute, install, maintain, repair, service and lease the Product when Defendant knew, or should have known, of prior accidents involving the Product and other coaters where user's body parts were pulled into the nip point hazard involved in Plaintiff's accident or similar nip point hazards on other models of the Product and other coaters;

(z).  Failing to eliminate the nip point hazard when Defendant knew, or should have known, of prior accidents involving the Product and other coaters where user's

body parts were pulled into the nip point hazard involved in Plaintiff's accident or similar nip point hazards on other models of the Product and other coaters;

(aa).  Failing to implement any of the alternative feasible designs set forth in paragraph 31 above, when Defendant knew or should have known of the Product's defective and unreasonable dangerous condition and the severe risk of harm the condition presented to the user, of the existence of said designs, and their effectiveness in eliminating the danger, their reasonable cost and their effectiveness in preserving the Product's utility;

(bb).   Acting negligent, careless and reckless as set forth in paragraphs (a) through (aa) above and all averments preceding Count I above with knowledge of, or in conscious disregard of the severe risk of harm caused to intended, ordinary, reasonable or reasonably foreseeable users or consumers using the subject Product, as intended, in a reasonable or reasonably foreseeable manner by Defendant's negligent, careless and reckless conduct;

(cc).  Undertake, gratuitously or for consideration, to perform the activities set forth in paragraphs (a) through (x) above that Defendant should have engaged in as part of the design, manufacture, sale, installation, inspection, distribution, maintenance, repair and servicing of said subject Product, and fail to perform said duties when such failure increased the risk of harm to Decedent and/or Decedent reasonably relied upon Defendant's compliance with said duties by using said Product.

51.  Solely as a result of the carelessness, negligence, and recklessness of Defendant as more fully set forth above, Plaintiff was caused to suffer injuries, all of which are or may be permanent in nature, to his bones, joints, muscles, tendons, blood vessels and soft tissues throughout his entire body, both internally and externally, including, but not limited to severe crush and amputation injuries to his left upper extremity and shoulder.

52.  Solely as a result of the above incident and injuries sustained thereby, Plaintiff has been and will be in the future obliged to expend various and diverse sums of money for medicine and medical treatment in an effort to cure the above injuries, all to his great financial loss and detriment.

53.  Solely as a result of the above incident and injuries sustained thereby, Plaintiff was unable to attend to his usual duties and occupation and thereby suffered loss and

depreciation of his earnings and earning power and will continue to suffer same for an indefinite period of time in the future, all to his great financial loss and detriment.

54.   Solely as a result of the above incident and injuries sustained thereby, Plaintiff has suffered physical pain, mental anguish, embarrassment and humiliation and will continue to suffer the same for an indefinite period of time in the future, all to his great financial loss and detriment.

55.   Solely as a result of the above incident and injuries sustained thereby, Plaintiff has been unable to engage in his usual and customary social and recreational activities and other pleasures of life and will be prevented from engaging in such activities in the future, all to his great financial loss and detriment.

WHEREFORE, Plaintiff, Mark Birch, demands judgment in his favor and against Defendant, GFG Peabody, Inc., on Count I of the Complaint, in an amount in excess of One Hundred Fifty Thousand and 0/100 Dollars ($150,000), plus interest, delay damages and costs of suit.

## COUNT II

### Mark Birch v. GFG Peabody, Inc.

**(STRICT LIABILITY)**

56.   Plaintiff, Mark Birch, incorporates by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

57.   Defendant, GFG Peabody, Inc., designed, manufactured, distributed, marketed, advertised, installed, maintained, repaired, serviced, leased and sold the Product.

58.  The Product was designed, manufactured, distributed, marketed, advertised, constructed, installed, serviced, maintained, repaired, leased and sold by Defendant with the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer while using the Product in its intended, ordinarily, reasonable and reasonably foreseeable uses.

59.  The Product reached the intended, ordinary, reasonable or reasonably foreseeable user or consumer, Plaintiff, without substantial change in the condition in which it was designed, manufactured, distributed, repaired, maintained, marketed, advertised, installed, serviced, leased and sold by Defendant.

60.  Defendant expected, intended and reasonably foresaw that the Product would reach the user or consumer, Plaintiff, without substantial change in the condition in which it was designed, manufactured, maintained, repaired, distributed, marketed, advertised, constructed, installed, serviced, leased and sold by Defendant and in which it left Defendant's possession or control.

61.  In the alternative, Defendant expected, intended and reasonably foresaw that design elements that created the aforesaid dangers would be incorporated into the Product by third parties, including but not limited to Plaintiff's employer, after said Product left the possession or control of Defendant, and that the intended, reasonable, ordinary and reasonably foreseeable user would use the Product with the design elements that created the aforesaid dangers.

62.  The use of the Product by Plaintiff and his employer at or about the time of the incident was intended, expected, reasonable and reasonably foreseeable to

Defendant and for the purposes and in such a manner intended, expected by and reasonable and reasonably foreseeable to Defendant.

63.   At all times relevant hereto, the aforesaid dangers were unknowable and unacceptable to the average or ordinary consumer using the Product in the intended, ordinary, reasonable and reasonably foreseeable uses.

64.   At all times relevant hereto, a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer using the Product in its intended, reasonable and reasonably foreseeable uses outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product, in its intended, ordinary, reasonable and reasonably foreseeable uses.

65.   Because the Product was designed, manufactured, distributed, marketed, advertised, constructed, installed, serviced, maintained, repaired, leased and/or sold by Defendant with the existence of the aforesaid dangers at the time it left Defendant's possession or control, or with Defendant's intent or knowledge that design elements would be added by third parties that created the aforesaid dangers after the Product left Defendant's possession or control, dangers that were unknowable and unacceptable to the average or ordinary consumer using the Product in the intended, reasonable and reasonably foreseeable uses of the Product, and a reasonable person would conclude that the probability and seriousness of harm created by the aforesaid dangers to the intended, ordinary, reasonable or reasonably foreseeable user or consumer using the

23

Product in its intended, reasonable and reasonably foreseeable uses outweighed the burden or costs of Defendant taking precautions to eliminate or substantially reduce the likelihood that said dangers would present themselves to the intended, ordinary or reasonably foreseeable users while using the Product in its intended, reasonable and reasonably foreseeable uses, the Product was designed, manufactured, distributed, marketed, advertised, constructed, installed, serviced, maintained, repaired, leased and/or sold by Defendant in a defective condition unreasonably dangerous to the intended, ordinary or reasonably foreseeable users while using the Product, including Plaintiff, in its intended, reasonable and reasonably foreseeable uses.

66.   Defendant failed to provide proper and adequate warnings to Plaintiff and Plaintiff's employer of the inherent and reasonably foreseeable dangers in the use of the Product, and the means and methods by which Plaintiff and Plaintiff's employer could effectively avoid the dangers during the intended, ordinary reasonably and reasonably foreseeable use of the Product.

67.   Defendant failed to provide proper and adequate warnings to Plaintiff and Plaintiff's employer of the defective and unreasonably dangerous condition of the Product, and the and the means and methods by which Plaintiff and Plaintiff's employer could effectively avoid said conditions during the intended, ordinary, reasonably and reasonably foreseeable use of the Product.

68. Defendant failed to provide proper and adequate instructions to Plaintiff and Plaintiff's employer of the safe and proper use of the Product.

69.   The Defendant failed to provide proper and adequate instructions and warnings to third parties regarding the safe and proper design, manufacture, marketing,

distribution, supply, advertisement, maintenance, installation, service, repair, leasing

and/or sale of the Product, and regarding the existence and means and methods to

protect the user or consumer from the defective and unreasonably dangerous condition

of the Product and the inherent and reasonably foreseeable dangers in the intended,

ordinary, reasonable and reasonably foreseeable use of the Product.

70.    By failing to provide proper and adequate warnings and instructions to

Plaintiff, Plaintiff's employer and third parties as aforesaid, Defendant  designed,

manufactured, marketed, distributed, supplied, advertised, maintained, serviced,

repaired, installed, leased and/or sold the Product in a defective condition unreasonably

dangerous to the user or consumer, which in this case is the Plaintiff.

71.    At all times relevant hereto, the existing, known or foreseeable

dangers and defective and unreasonably dangerous condition of the Product as

aforesaid could have been reduced or avoided by Defendant by the adoption of a

feasible alternative design, including any of said feasible alternative designs set

forth in paragraph 35, and the omission of said alternative design rendered said

Product, defective and unreasonably dangerous.

72.    At all times relevant hereto, the foreseeable risks of harm posed by the

Product, could have been reduced or avoided by the provision of reasonable instructions

or warnings by Defendant, and the omission of the instructions or warnings rendered the

Product defective and not reasonably safe.

73.    The injuries and damages to Plaintiff, as more fully set forth in Count I above,

were directly, proximately, substantially, and legally caused by the defective and

unreasonably dangerous condition of the Product.

25

74.   Defendant is strictly liable to Plaintiff pursuant to Restatement (Second) of Torts, Section 402(A), and/or pursuant to the Pennsylvania Supreme Court's decision in *Tincher v. Omega Flex*, 2014 Pa. LEXIS (Pa. 2014) and subsequent precedent.

75.   At all times relevant hereto, Defendant knew, or had reason to know of the defective and unreasonably dangerous condition of the Product.

76.   At all times relevant hereto, Defendant designed, fabricated, manufactured, marketed, distributed, maintained, repaired, serviced, installed, supplied, leased and/or sold said Product in conscious disregard of, or reckless indifference to the high degree of risk of harm to the user of the Product posed by the defective and unreasonably dangerous condition thereof.

WHEREFORE, Plaintiff, Mark Birch, demands judgment in his favor and against Defendant, GFG Peabody, Inc., on Count II of the Complaint, in an amount in excess of One Hundred Fifty Thousand and 0/100 Dollars ($150,000), plus delay damages, interest and costs of suit.

## COUNT III

### Mark Birch v. GFG Peabody, Inc.

### (BREACH OF WARRANTY)

77.   Plaintiff, Mark Birch, incorporates by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

78.   In connection with and as part of the design, manufacture, marketing, distribution, supply, advertising, maintenance, servicing, repair, installation, leasing and/or sale of the Product, Defendant, GFP Peabody, Inc., conveyed various guarantees

26

and warranties, both express and implied, including but not limited to warranties to the effect that reasonable care was used in the design, manufacture, marketing, distribution, supply, advertising, maintenance, servicing, repair, installation, leasing and/or sale of the Product and that said Product was safe and effective for its ordinary and intended use, fit for its intended purposes, adequately and properly designed, manufactured, marketed, distributed, supplied, advertised, maintained, serviced, repaired, installed, leased and/or sold, not defective and not unreasonably dangerous for  its intended, ordinary, reasonable and reasonably foreseeable uses, and merchantable or of merchantable quality.

79.   Defendant breached said warranties, including but not limited to the express warranties, the warranties of merchantability and safety and fitness for use, in that the Product was not of merchantable quality and was not safe or fit for its normal, intended, expected, reasonable or reasonably foreseeable uses and purposes.

80.   The aforesaid warranties were made for the benefit of, and are enforceable by Plaintiff.

81.   Plaintiff reasonably relied on said warranties in using the Product.

82.   Defendant's breach of said warranties was the direct, proximate, legal and substantial cause of the injuries and damages to Plaintiff previously set forth in Count I herein.

83.   At all times relevant hereto, Defendant knew, or had reason to know of the breach of said warranties.

84.   At all times relevant hereto, Defendant's breach of said warranties created a high degree of risk of harm to the user of the Product.

85.   At all times relevant hereto, Defendant designed, fabricated, manufactured, marketed, distributed, serviced, maintained, repaired, supplied, leased and/or sold the Product in conscious disregard of, or indifference to the high degree of risk of harm to the user of the Product posed by the breach of the warranties.

86.   Defendant's breach of said warranties was the direct, proximate, legal and substantial cause of the injuries and damages to Plaintiff previously set forth in Count I herein.

WHEREFORE, Plaintiff, Mark Birch, demands judgment in his favor and against Defendant, GFG Peabody, Inc., on Count III of the Complaint, in an amount in excess of One Hundred Fifty Thousand and 0/100 Dollars ($150,000), plus delay damages, interest and costs of suit.

### COUNT IV

### **Crystal Birch v. GFG Peabody, Inc.**
### **(LOSS OF CONSORTIUM)**

87.   Spouse-Plaintiff, Crystal Birch, incorporates by reference the preceding paragraphs of this Complaint as if fully set forth at length herein.

88.   As a sole result of the conduct of Defendant as set forth in Counts I through III above, Spouse-Plaintiff has been obliged to incur and will continue to incur for an indefinite period of time into the future many costs for medicine, medical care and

attention, and hospitalization in an attempt to treat Plaintiff for the injuries sustained by him in the incident, all to her great financial loss and detriment.

89.   As a further result of the conduct of Defendant as set forth in Counts I through III above, Spouse-Plaintiff has been deprived of the society, comfort, assistance and consortium of her husband, Plaintiff, and will continue to be deprived of the foregoing for an indefinite period of time into the future, all to her great financial loss and detriment.

WHEREFORE, Plaintiff, Crystal Birch, demands judgment in her favor and against Defendant, GFG Peabody, Inc., on Count IV of the Complaint, in an amount in excess of One Hundred Fifty Thousand and 0/100 Dollars ($150,000), plus interest, delay damages and costs of suit.

**COHEN, FEELEY, ALTEMOSE & RAMBO, P.C.**

BY:_____
    Mark K. Altemose, Esquire
    I.D. No. 58939
    2851 Baglyos Circle
    Bethlehem, PA  18020
    (610) 625-2100
    maltemose@cohenfeeley.com
    ***Attorney for Plaintiffs***

**EXHIBIT "A"**

